UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| BRETT M.,[1] | CIV. 18-5042-JLV |
| Plaintiff, | |
| vs. | ORDER |
| ANDREW M. SAUL, Commissioner, Social Security Administration,[2] | |
| Defendant. | |

**INTRODUCTION**

Plaintiff Brett M. brought this action to challenge the decision of the

Commissioner of the Social Security Administration denying him Title II

disability insurance benefits.   See 42 U.S.C. § 401 *et seq.*   Mr. M. moves to

reverse the Commissioner's decision and asks the court to grant him benefits.

(Docket 15).   The Commissioner opposes the motion.   (Docket 16).   The

parties filed a joint statement of material facts and the administrative record of

---

[1]The Administrative Office of the Judiciary suggested the court be more mindful of protecting from public access the private information in Social Security opinions and orders.   For that reason, the Western Division of the District of South Dakota will use the first name and last initial of every non-governmental person mentioned in the opinion.   This includes the names of non-governmental parties appearing in case captions.

[2]Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019.   Commissioner, Social Security Administration, available at https://www.ssa.gov/agency/commissioner.html (last accessed Oct. 15, 2019).   He is automatically substituted as the defendant in this action.   Fed. R. Civ. P. 25(d).

this case.   (Dockets 12 & 20).   The court finds a number of legal errors in the administrative proceeding requires reversal and remand for rehearing.

I.    **Facts**

   A.    **September 2008 hospitalization**

   In September of 2008, Mr. M. experienced acute panic attacks.   He presented at the Rapid City Regional Hospital in Rapid City, South Dakota, with a panic attack on September 13.   (Docket 12 at ¶ 4).   He was treated and discharged.   Id.   On September 15, he presented at a local medical clinic with "[a]cute confusion," "blank stares" and "possibly psychosis."   (AR at p. 725).[3] Mr. M.'s mother told the treating physician that Mr. M. was not eating, was having "staring episodes" and had to be told to use the restroom and take a shower.   Id.   The physician sent Mr. M. to the emergency room at Rapid City Regional.   Id.; Docket 12 at ¶ 6.

   Psychiatrist Dr. Mark G. evaluated Mr. M. at Rapid City Regional.   Mr. M. presented as paranoid and generally unintelligible.   Docket 12 at ¶ 10; see also AR at pp. 356-57.   Dr. G. found Mr. M. had a Global Assessment of Functioning ("GAF") score of 20, indicating he had a gross impairment to communication.[4] (Docket 12 at ¶ 10).   Dr. G. diagnosed Mr. M. with anxiety and psychotic

_____

   [3]The court cites to the administrative record in this case as "AR."   The complete record is filed at docket entry 20.

   [4]"The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning on a hypothetical continuum of mental health-illness."   Halvorsen v. Astrue, 600 F.3d 922, 925 n.4 (8th Cir. 2012) (internal quotation omitted).

disorders, not otherwise specified, and admitted him to the psychiatric ward. Id.

Mr. M. was hospitalized in the psychiatric ward from September 15 until September 23. (Docket 12 at ¶ 11; see also AR at pp. 354-81). On September 17, Dr. Kari S. performed a psychological evaluation on Mr. M. (Docket 12 at ¶ 11; AR at pp. 368-73). During the evaluation, Mr. M. exhibited significant paranoia, illogical thought processes, obsessive thinking, and tremendous anxiety. (Docket 12 at ¶¶ 11-13). He also had difficulty communicating with Dr. S., causing her to struggle to complete the assessment. (AR at pp. 370-71). Dr. S. diagnosed Mr. M. with psychotic disorder, not otherwise specified, and obsessive-compulsive disorder. (Docket 12 at ¶ 13). She found a GAF score of 24. Id. She opined Mr. M. should be institutionalized if his ability to care for himself and communicate did not improve. Id. at ¶ 14.

Dr. G. evaluated Mr. M. again on September 22. (Docket 12 at ¶ 15). Mr. M. displayed "a very distressed affect," "thought blocking" and "little vocalizations." Id. at ¶ 16. Dr. G. agreed with Dr. S. that Mr. M. may have been suffering from "a very severe form of obsessive compulsive disorder" with "some manifestations of psychosis[.]" Id. He continued Mr. M.'s involuntary hospitalization and opined he may need to be transferred to a long-term psychiatric care facility. Id. at ¶ 18.

Dr. G. increased Mr. M's dosage of Lexapro, an antidepressant, and his mental condition rapidly improved, to the point he displayed an "almost

complete recovery[.]"   Id. at ¶¶ 19-20; AR at p. 377.   The mental health hold on

Mr. M. was dropped on September 23.   (Docket 12 at ¶ 21).   He chose not to

remain in the hospital as a voluntary patient.   Id.

**B.     Mental health between 2008 & 2015**

Mr. M. did not seek any medical treatment for mental health issues

between September 23, 2008 and July 8, 2015.   (Docket 15 at p. 3).   The record

evidence concerning Mr. M.'s mental health during this timeframe comes from

lay witnesses.   Mr. M.'s sister-in-law, Rebecca M., testified at his August 12,

2017, administrative hearing before Administrative Law Judge ("ALJ") Richard

Opp.   (Docket 12 at ¶ 49; see also AR at pp. 41-49).   She testified she spoke to

Mr. M. over the phone about once a month prior to September 30, 2014.

(Docket 12 at ¶ 49).   She further testified that Mr. M. was "very anxious" and

"not going out" of his house.   (AR at p. 43).   He would buy groceries at night to

minimize his time away from his mother.   Id. at p. 44.   Mr. M. worried that

someone would take his mother away from him.   Id. at p. 43.   Ms. M. believed

"it was like he was terrified to leave" the home.   Id. at p. 44.

Ms. M. also testified she visited Mr. M. in person around the time of his

mother's death in 2015 for three weeks.   Id. at pp. 44, 48.   During the visit, she

noticed Mr. M. would "start[] at things" and "have anxiety attacks."   Id. at p. 44.

He "would only sleep in the chair in the living room" and would easily waken at

"any little noise[.]"   Id. at p. 47.   His panic attacks were "almost constant."   Id.

at p. 48.   She believed he was suffering "terrible anxiety" and displaying "almost

paranoia" and "obsessive compulsive behavior[.]" Id. at p. 45. Ms. M. also testified that Mr. M. would speak to neighbors occasionally and that they knew "he had had a hard time[.]" Id. at p. 49.

In "[o]bservation notes" dated August 13, 2015, while Ms. M. was staying with Mr. M., she memorialized some of her experiences with Mr. M. (Docket 12 at ¶¶ 60-64; AR at pp. 268-69). She noted he was confused, easily startled, and unable to focus on stimuli. Id. She described him repetitively completing minor tasks ("picking up any tiny speck" of dirt off a rug and "fiddling with cables" behind a television, for example) and expressing anxiety and fear over appointments and paperwork. Id.

Debie P., a friend of Mr. M.'s since childhood, submitted an affidavit on his behalf. (Docket 12 at ¶¶ 56-59; AR at pp. 270-71). She had contact with Mr. M. approximately once a month. (AR at p. 270). She characterized him as "essentially a hermit who lived in his Mother's basement and did not have any contact with other people." Id. She also stated Mr. M. did his shopping at night "so that he would not see other people at the store." Id. at p. 271. Ms. P. believed "[h]e was unable to handle being around anyone other than his Mom and close family members or close friends due to extreme anxiety" and was "basically house-bound due to his anxiety for several years prior to September 30, 2014." Id.

### C.  July 2015 hospitalization & post-hospitalization treatment

Mr. M. was hospitalized on July 8, 2015, after police officers responded to a 911 call he placed and found him in a "semi-catatonic state." (Docket 12 at ¶ 30). Dr. Stephen M. and Amy N., a certified nurse practitioner, examined Mr. M. (AR at pp. 272-75). Ms. N. noted Mr. M. had difficulty communicating and "seem[ed] to be responding to internal stimuli." Id. at p. 273. He reported auditory hallucinations but would not elaborate. Id. They concluded Mr. M. was catatonic and treated him with Ativan, an anxiety medication. Id. at p. 274. By July 15, Mr. M.'s catatonia resolved. (Docket 12 at ¶ 31). He was discharged from the hospital on that date. Id. At the time of discharge, Mr. M. appeared "isolative, depressed and highly anxious" as well as "[t]hought disordered[.]" (AR at p. 277).

After this hospitalization, Mr. M. received more regular mental health treatment. (Docket 12 at ¶¶ 32-36). During his initial outpatient psychotherapy appointments, providers noted Mr. M. appeared to be responding to internal stimuli, although he denied hallucinations. (AR at pp. 417 & 420). His GAF at his first two appointments was 30, which corresponds to an inability to function or a serious impairment in communication or judgment. Id. Mr. M. regularly received psychotherapy care between July 29, 2015 and February 12, 2017. (Docket 12 at ¶ 34; AR at p. 412). The highest GAF score reported by his care providers was 50, indicating serious mental symptoms or serious impairment in functioning. (Docket 12 at ¶ 35).

One of Mr. M.'s care providers during this time was psychiatrist Dr. Terry H. Id. at ¶ 34. On August 29, 2017, Dr. H. completed a "Medical Source Statement" form created by the Social Security Administration describing his view of Mr. M.'s ability to "do work-related activities on a sustained basis." (Docket 12 at ¶ 36; AR at pp. 805-08). Dr. H. opined Mr. M.'s mental impairment created "extreme" restriction in his ability to carry out complex instructions or make complex work-related decisions, interact appropriately with the public, and respond appropriately to usual work situations and to changes in a routine work setting. (AR at pp. 806-07). He stated Mr. M.'s "lack of communication skills + anxiety make it nearly impossible to be in public[,] let alone take, remember + follow through with instruction. His lack of affect is very unsettling to people in general." Id. at p. 807. Dr. H. noted Mr. M.'s limitations first presented in September 2008, and cited his hospitalization as evidence. Id.

**D.    Administrative hearing & procedural history**

Mr. M. applied for Title II disability insurance benefits on April 21, 2015. (Docket 12 at ¶ 1). In his initial application, he alleged he was disabled due to gout and back pain and did not mention his anxiety disorder. (AR at p. 53). He alleged his disability began on March 1, 2011. (Docket 12 at ¶ 1). His claim was denied on June 16, 2015, and denied again upon reconsideration on October 6, 2015. (AR at p. 11). He then requested an administrative hearing. Id. Prior to the hearing, Mr. M.'s counsel filed a short brief asserting

the record "support[s] a finding of disability due to severe anxiety." <u>Id.</u> at p. 247. The hearing took place on August 14, 2017 before ALJ Opp. (Docket 12 at ¶ 2).

Mr. M. testified at the hearing. (Docket 12 at ¶¶ 42-44; AR at pp. 32-35). He stated he does not leave the home unless he has appointments or "absolutely ha[s] to go" places. (AR at p. 33). He stated he "just do[es not] feel comfortable" going outside and does not have any friends. <u>Id.</u> at p. 34. He stopped going to church because he felt uncomfortable. <u>Id.</u> He was unable to sleep consistently without feeling compelled to move around. <u>Id.</u> at p. 32.

Kristy H., Mr. M.'s case manager at his psychotherapy provider, also testified at the hearing. (Docket 12 at ¶¶ 45-48; AR at pp. 35-40). She testified she began working with Mr. M. in September or October of 2015. (AR at p. 36). She stated Mr. M. typically presented as distracted, jumpy and slow to process conversation. <u>Id.</u> at pp. 36, 38. She also noted his difficulty in leaving his home and stated he would refuse to leave home if there was any snow on the ground. <u>Id.</u> at p. 37.

As described above, Ms. M. testified at the hearing. (AR at pp. 40-50). Finally, William T., a vocational expert, briefly testified. (Docket 12 at ¶ 55; AR at pp. 50-51). Mr. T. stated Mr. M. previously worked as a jewelry engraver. <u>Id.</u> Neither the ALJ nor Mr. M.'s counsel asked Mr. T. any hypothetical questions regarding his ability to work at other jobs or the availability of other jobs in the local or national economy suitable for a worker with Mr. M.'s limitations.

The ALJ denied Mr. M.'s claim on November 24, 2017. (Docket 12 at ¶ 3; AR at pp. 8-21). He concluded Mr. M. did not have a severe impairment or combination of impairments. (AR at p. 14). The ALJ first concluded Mr. M.'s gout and back pain were not severe. Id. at pp. 15-17. He next found Mr. M.'s anxiety disorder "had no more than minimal impact on [his] ability to work and is therefore not a severe impairment." Id. at p. 18. The ALJ discounted Dr. H.'s medical source statement, Ms. M.'s testimony and Ms. P.'s affidavit. Id. at pp. 18-20. He also noted much of Mr. M.'s evidence regarding his mental health postdated September 30, 2014, his last date insured under Title II. Id. at pp. 18-21. The ALJ held Mr. M. was not disabled between March 1, 2011 and September 30, 2014. Id. at p. 21.

Mr. M. appealed the ALJ's decision to the Social Security Administration Appeals Council on December 21, 2017. Id. at p. 140. The Appeals Council denied the appeal on May 31, 2018, making the ALJ's decision the final administrative action in the case. Id. at p. 1. Mr. M. filed his complaint in this court on June 27, 2018. (Docket 1).

## II.    **Legal Standard**

The Commissioner's findings "as to any fact . . . shall be conclusive" if they are "supported by substantial evidence." 42 U.S.C. § 405(g). The court also reviews the Commissioner's decision for errors of law. Nash v. Comm'r, Soc. Sec. Admin., 907 F.3d 1086, 1089 (8th Cir. 2018). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it

adequate to support the Commissioner's conclusions." Twyford v. Comm'r, Soc. Sec. Admin., 929 F.3d 512, 516 (8th Cir. 2019) (internal quotation omitted). The court not only examines "the record for the existence of substantial evidence in support of the Commissioner's decision," it also "take[s] into account whatever in the record fairly detracts from that decision." Gann v. Berryhill, 864 F.3d 947, 950 (8th Cir. 2017) (internal quotation omitted). But if "the record supports two inconsistent conclusions, [the court] must affirm the Commissioner's choice between those two conclusions." Twyford, 929 F.3d at 516 (citation omitted).

Social Security Act regulations create a five-step process to determine whether a claimant is entitled to disability benefits. See 20 C.F.R. § 404.1520.

> The steps are: (1) Is the claimant currently performing substantial gainful activity (SGA)? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix I? (4) Does the impairment prevent the claimant from performing past relevant work? (5) Does the impairment prevent the claimant from doing any other work?

Bryant v. Colvin, 861 F.3d 779, 782 n.3 (8th Cir. 2017) (citing 20 C.F.R. § 404.1520(a)(4)). If the ALJ concludes a claimant is disabled or not disabled at any step of the process, the evaluation ends. 20 C.F.R. § 404.1520(a)(4).

## III. Analysis

The ALJ concluded Mr. M. was not performing substantial gainful activity, satisfying step one of the five-step inquiry. (AR at p. 13-14). However, the ALJ found Mr. M. did not have a severe impairment and ended the inquiry at step

two,. Id. at p. 14.   Mr. M. argues the ALJ erred in making this finding.

Specifically, he asserts the ALJ erred by:

1.  Failing to address or make a credibility finding regarding his testimony.   (Docket 15 at pp. 8-9).

2.  Rejecting lay witnesses Ms. M.'s and Ms. P.'s statements.   Id. at pp. 10-11.

3.  Rejecting treating psychiatrist Dr. H.'s opinions.   Id. at pp. 12-17.

Mr. M. asks the court to grant him benefits without remand to the agency.   Id. at p. 17.   The Commissioner responds that the ALJ had substantial reasons for rejecting the witness testimony.   (Docket 16).   The court finds the ALJ erred by failing to address Mr. M.'s credibility and by rejecting his lay witnesses and treating psychiatrist, requiring remand for rehearing.[5]

**A.    Credibility of Mr. M.**

Mr. M. first challenges the ALJ's evaluation of his testimony at the administrative hearing.   (Docket 15 at pp. 8-9).   He asserts the ALJ legally erred by failing to make an explicit credibility determination regarding his testimony.   Id. at p. 8.   He further argues the ALJ erred in emphasizing his lack of mental health treatment between 2008 and 2015.   Id. at pp. 8-9.   In Mr. M.'s view, his lack of treatment during that time period does not mean "his anxiety condition was controlled and in remission[.]"   Id. at p. 9.   The Commissioner

---

[5]Mr. M. does not contest the ALJ's finding that he is not disabled due to his gout or back pain.   The court only addresses whether the ALJ erred in finding him not disabled due to his anxiety disorder.

responds that record evidence supports the ALJ's evaluation. (Docket 16 at pp. 2-6).

An ALJ must "consider the following factors when evaluating a claimant's credibility:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints."

Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "An ALJ need not explicitly discuss each Polaski factor. It is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004) (citation omitted).

"Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, we will defer to her decision. An ALJ may decline to credit a claimant's subjective complaints if the evidence as a whole is inconsistent with the claimant's testimony." Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) (internal quotations and citations omitted). However, "an ALJ may not discount a claimant's allegations solely because the objective medical evidence does not fully support them[.]" Bernard v. Colvin, 774 F.3d 482, 488 (8th Cir. 2014) (internal quotation and alteration omitted).

The ALJ found Mr. M.'s "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"[6]  (AR at p. 17).  This statement is the ALJ's sole commentary even remotely related to Mr. M.'s credibility.[7]  The ALJ never acknowledged Mr. M. testified at the administrative hearing or openly referred to his testimony.  He never cited the <u>Polaski</u> factors or undertook any analysis the court could construe as satisfying the requirements of <u>Polaski</u> and its progeny.  Merely finding Mr. M.'s "statements"—the ALJ did not note whether he was referring to Mr. M.'s application materials or hearing testimony—were inconsistent with other medical evidence is insufficient for the court to infer whether the ALJ found Mr. M. credible.  The court concludes the ALJ never "explicitly" credited or discredited Mr. M.'s subjective complaints. <u>Buckner</u>, 646 F.3d at 558 (internal quotation omitted).

This was legal error.  Mr. M.'s testimony supported his claim of disabling mental illness during the insured period.  He testified about inability to sleep, discomfort with leaving the house, night wanderings and lack of social contact.

---

[6]The court is unsure whether the ALJ intended this statement to refer to Mr. M.'s anxiety as well as his gout and back pain.  The statement is made after a discussion of his gout and back pain and precedes the first mention of his anxiety disorder.  However, the ALJ's discussion of Mr. M.'s anxiety disorder makes clear he considered Mr. M.'s lack of mental health treatment between 2008 and 2015 relevant.  (AR at p. 18).  The court will assume the ALJ intended his statement to apply to Mr. M.'s anxiety disorder.

[7]The ALJ's failure to explicitly make a credibility determination regarding Mr. M. is striking in contrast to his credibility determinations regarding his treating psychiatrist and lay witnesses.  (AR at pp. 18-20).

(AR at pp. 32-35).   Crucially, he also testified these symptoms were present before his mother died in 2015, which supports the claim his anxiety disorder was active during his insured period.   Id. at pp. 33-34.   Had the ALJ explicitly discredited Mr. M.'s testimony after conducting a Polaski analysis, the court would owe that finding considerable deference.   Here, the ALJ made no explicit credibility findings to which the court can defer.   A remand is appropriate to allow the ALJ to consider Mr. M.'s credibility in the first instance.   Julin, 826 F.3d at 1086 ("Credibility determinations are the province of the ALJ . . . .").   On remand, the ALJ should evaluate Mr. M.'s credibility under Polaski and make an explicit credibility finding.

### B.   Lay witness testimony

Mr. M. next challenges the ALJ's rejection of testimony by his lay witnesses Rebecca M. and Debie P.   (Docket 15 at pp. 10-11).   He argues the ALJ's rejection is based on factual inaccuracies.   Id.   In particular, he asserts both witnesses testified to Mr. M.'s condition during the insured period, contrary to the ALJ's findings.   Id.   He also contests the ALJ's finding that Ms. P.'s written testimony was too general to be useful.   Id. at p. 11.   The Commissioner responds that the ALJ properly rejected the lay witness testimony.   (Docket 16 at pp. 6-10).

"Once the diagnosis is established, but the severity of the degenerative condition during the relevant period is unanswered, the claimant may fill the evidentiary gap with lay testimony."   Grebenick v. Chater, 121 F.3d 1193, 1199

(8th Cir. 1997) (citing <u>Basinger v. Heckler</u>, 725 F.2d 1166, 1169 (8th Cir. 1984)). "The ALJ must consider this evidence, even if it is uncorroborated by objective medical evidence. Under this standard, the ALJ's credibility determination of the lay witnesses becomes critical, because the ALJ is, of course, free to believe or disbelieve any or all of the lay witnesses." <u>Id.</u>

The ALJ gave Ms. M.'s and Ms. P.'s testimony little weight. (AR at pp. 19-20). As for Ms. M., the ALJ relied on her lack of medical training, the fact that her notes regarding her 2015 stay with Mr. M. postdated his last insured date, and his own conclusion that Ms. M.'s testimony "was not consistent with the claimant's lack of complaint concerning mental impairments during the relevant period." (AR at p. 19).

These factors were legitimate bases for the ALJ's decision to give little weigh to Ms. M.'s testimony. However, as Mr. M. points out, the ALJ seemingly ignored Ms. M.'s testimony regarding her contact with Mr. M. during the insured period. (Docket 15 at p. 10). Ms. M. testified she spoke to Mr. M. approximately once a month during his insured period. (Docket 12 at ¶ 49). She testified about Mr. M.'s anxiety symptoms during the insured period, including that he was uncomfortable leaving the house and was "really stressed out" caring for his mother. <u>Id.</u> at ¶¶ 49-51.

The court cannot discern from the ALJ's decision whether he considered Ms. M.'s testimony regarding Mr. M.'s condition during the insured period. This is not a harmless omission—the ALJ wrote that his most important reason for

discrediting Ms. M.'s testimony was because it concerned her 2015 stay with Mr. M. (AR at p. 19). But Ms. M. did not testify only about her 2015 observations of Mr. M. Her insured period testimony supported Mr. M.'s claim. The ALJ had a duty to consider the entirety of Ms. M.'s testimony in determining her credibility. See Grebenick, 121 F.3d at 1199; Basinger, 725 F.2d at 1170. The court "cannot speculate whether or why [the] ALJ rejected" Ms. M.'s insured period testimony. Jones v. Chatner, 65 F.3d 102, 104 (8th Cir. 1995). A remand is appropriate to allow the ALJ to consider whether Ms. M.'s testimony concerning Mr. M.'s condition during the insured period detracts from the reasons he stated for discrediting her testimony. Id. ("[R]emand is necessary to fill this void in the record.").

The ALJ also discredited Ms. P.'s written testimony. (AR at p. 20). He characterized her testimony as so "general as to give little insight into [Mr. M.'s] specific behavior and symptoms." Id. He also found significant that Ms. P. did not state whether her belief was "based on hearsay, inference or first-hand knowledge." Id. Finally, he noted Ms. P. had contact with Mr. M. during 2015, after the insured period. Id.

As with Ms. M.'s testimony, the ALJ's findings regarding Ms. P.'s affidavit ignore her statements regarding Mr. M.'s symptoms during the insured period. Ms. P. stated she had contact with Mr. M. approximately once a month before July of 2015. (AR at p. 270). She made this statement almost immediately after a sentence noting she was "asked to describe [her] observations of [Mr. M.]

during the time period immediately prior to September 30, 2014" (the expiration of the insured period).   Id.   Contrary to the ALJ's findings, it is clear Ms. P. intended her description of Mr. M.'s condition to cover his insured period.

Unlike with Ms. M.'s testimony, the ALJ did not emphasize the timeliness of Ms. P.'s observations as the key reason for rejecting them.   Nevertheless, the court is not free to infer the ALJ considered Ms. P.'s insured period testimony before rejecting her testimony.   Jones, 65 F.3d at 104.   On remand, the ALJ must consider Ms. P.'s insured period testimony in evaluating her credibility and determining the weight to be assigned to her testimony.

## C.    Dr. H.'s testimony

Mr. M.'s last challenge concerns the rejection of treating psychiatrist Dr. Terry H.'s retrospective opinion that his anxiety was present during the insured period.   (Docket 15 at pp. 12-17).   He argues the ALJ erred in discounting the retrospective opinion because he did not seek mental health treatment between 2008 and 2015.   Id. at pp. 12-13.   He asserts the ALJ's reasoning that his "failure to seek out mental health treatment means he wasn't mentally ill" is "erroneous."[8]   Id. at p. 17.   The Commissioner argues substantial evidence

---

[8]Mr. M. does not challenge the ALJ's failure to evaluate Dr. H.'s opinions as those of a treating psychiatrist.   See 20 C.F.R. § 404.1527(c) (requiring ALJs to evaluate weight of treating medical sources using enumerated factors); House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (noting a treating source's opinion may be entitled to special weight).   The court is troubled by the short shrift the ALJ gave to Dr. H.'s opinions, which is inconsistent with the weight treating sources generally receive.   On remand, the ALJ should carefully evaluate Dr. H.'s opinion under the standards applicable to treating sources.

supported the ALJ's decision to discredit Dr. H.'s retrospective opinion.   (Docket 16 at pp. 11-12).

In a preprinted Social Security Administration form, Dr. H. opined Mr. M.'s anxiety disorder first presented during his 2008 hospitalization.   (AR at p. 807). He supported the opinion with reference to the hospitalization records "document[ing] severe emotional dysfunction requiring intensive inpatient treatment."   Id.   The ALJ discounted Dr. H.'s retrospective opinion because: (1) the 2008 hospitalization was nine years before he filled out the form stating his opinion; (2) Mr. M. "show[ed] much improvement upon his hospital release"; (3) Mr. M. did not seek mental health treatment "for several years"; and (4) Dr. H. did not treat Mr. M. during the insured period.   (AR at pp. 18-19).   The ALJ appeared to most heavily emphasize Mr. M.'s lack of mental health treatment between 2008 and 2015.   Id.

"Retrospective medical diagnoses constitute relevant evidence of pre-expiration disability.   Where the impairment onset date is critical, however, retrospective medical opinions alone will usually not suffice unless the claimed disability date is corroborated, as by subjective evidence from lay observers like family members."   Jones, 65 F.3d at 104.

In discrediting Dr. H.'s retrospective opinion, the ALJ erroneously discounted evidence of Mr. M.'s 2008 hospitalization.   The ALJ noted Mr. M. alleged a disability onset date of March 2011 and evidently refused to consider that the onset date could have preceded Mr. M.'s estimate.   (AR at p. 18).

However, binding Social Security policy in place during this case's pendency required the ALJ to "establish the onset date of disability."[9]  Social Security Ruling 83-20, 1983 WL 31249 at *1; see also Grebenick, 121 F.3d at 1200 (Social Security Rulings are binding on ALJs).   The "starting point" of this inquiry is the claimant's onset allegation.   1983 WL 31249 at *2.   But the ALJ must also consider the claimant's work history "and the medical and other evidence concerning impairment severity."   Id.   "Medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability."   Id.

SSR 83-20 includes specific factors an ALJ should consider when determining the onset of a disability "[i]n cases of . . . previously hospitalized claimants alleging disability on the basis of a psychiatric impairment."   Id. at *4. These factors include medical history, notes from hospital medical staff and lay evidence.   Id. at *4-5.   The Ruling notes that "mentally ill persons may not be capable of protecting themselves from possible loss of benefits by furnishing necessary evidence concerning onset" and that "development [of the record] should be undertaken in such cases to ascertain the onset date of the incapacitating impairment."   Id. at *5.

---

[9]The Social Security Administration replaced SSR 83-20 on October 2, 2018.   Social Security Ruling 18-01p, 83 Fed. Reg. 49,613 (Oct. 2, 2018).   SSR 18-01p states it will apply "in appropriate cases" following the remand of a case initiated under SSR 83-20.   Id. at 49,616.   The court leaves the question of whether to apply SSR 83-20 or 18-01p on remand to the ALJ in the first instance.

The ALJ used the period from March 2011 to September 30, 2014, as the time frame in which Mr. M. had to show his anxiety condition was disabling. The evidence of Mr. M.'s 2008 hospitalization, however, is highly probative of the potentially disabling nature of his anxiety condition and the timing of the condition's onset. Under SSR 83-20, the ALJ should have taken that hospitalization into account when determining the onset date. Taking Mr. M.'s estimate as conclusive evidence of the onset date precluded the possibility that he may have become disabled as a result of the 2008 psychotic episode. This was error. On remand, the ALJ should independently determine the onset of Mr. M.'s anxiety disorder without relying exclusively on his alleged onset date.

The ALJ also improperly rejected Dr. H.'s retrospective opinion by using Mr. M.'s lack of mental health treatment between 2008 and 2015. Social Security Ruling 16-3p requires ALJs *not* to "find an individual's symptoms inconsistent with the evidence in the record" simply because the claimant failed to seek treatment "without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints." Social Security Ruling 16-3p, 2016 WL 1119029 at *8 (Mar. 16, 2016). The Ruling lists a number of factors ALJs should consider when evaluating the impact of a lack of treatment on a claimant's or witness' credibility, including lack of ability to pay for treatment and the possibility mental illness may impede seeking treatment. Id. at *9. An ALJ must "consider and address reasons for not pursuing treatment that are pertinent to an individual's case" and must "explain

how [he] considered the individual's reason in [his] evaluation of the individual's symptoms."   Id.

Here, the ALJ simply contrasted Mr. M. seeking medical treatment for his joint problems with his lack of treatment for his anxiety condition.   (AR at pp. 18-19).   He did not ask Mr. M. or any other witness why he did not seek mental health treatment, nor does the record explain why.   Using Mr. M.'s lack of mental health treatment to discredit Dr. H.'s retrospective opinion without attempting to ascertain why Mr. M. did not seek treatment was error.   SSR 16-3p requires a more thorough evaluation.

In his briefing before this court, Mr. M. states he did not seek mental health treatment because he had "secluded himself into a highly structured environment" caring for his mother and did not feel comfortable leaving the house.   (Docket 18 at p. 10).   It is for the ALJ in the first instance to ascertain whether Mr. M. did not seek mental health treatment for this reason or another and determine whether his reasons for not seeking treatment bear on his credibility or the credibility of Dr. H.'s retrospective opinion.   Remand is appropriate on this issue.

###   D.   Remand

As described above, the court finds the ALJ's decision was marred by multiple instances of legal error.   Reversal is required, but the court must determine whether remand or an award of benefits is the appropriate remedy. Mr. M. asks the court to order the Commissioner to award benefits, arguing the record convincingly establishes disability.   (Docket 15 at p. 17).   The

Commissioner, having argued the ALJ's decision should be affirmed, does not take a position on an appropriate post-reversal remedy.

The court first concludes the existing record does not permit the court to order the Commissioner to award benefits.   The ALJ ended his inquiry at step two of the five-step process in determining disability.   (AR at p. 14).   The ALJ did not consider whether Mr. M.'s anxiety condition met the criteria of a listed impairment, determine his residual functional capacity, or consider whether Mr. M. could perform past relevant work or any other work.   Bryant, 861 F.3d at 782 n.3 (citing 20 C.F.R. § 404.1520(a)(4)).   The record is not sufficiently developed to enable the court to make these findings in the first instance.   See Papesh v. Colvin, 786 F.3d 1126, 1135 (8th Cir. 2015) (allowing courts to order payment of benefits only where the "record overwhelmingly supports" a disability finding).

"Section 405(g), which governs judicial review of final decisions made by the Commissioner, authorizes only two types of remand orders: (1) those made pursuant to sentence four, and (2) those made pursuant to sentence six." Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).   "A sentence four remand is . . . proper whenever the district court makes a substantive ruling regarding the correctness of a decision of the Commissioner and remands the case in accordance with such a ruling."   Id.   As relevant here, "[s]entence six, in contrast, authorizes a remand . . . where new and material evidence is adduced that was for good cause not presented during the administrative proceedings." Id.   "[R]emand orders that do not expressly affirm, modify, or reverse a decision of the Commissioner but rather direct him to cure some specific defect in the

administrative proceeding, such as the ALJ's failure to develop the record or to properly evaluate the evidence, are . . . sentence four remands." Id. at 1011.

Here, a sentence four remand is appropriate. No party brought additional evidence to the court's attention that was not presented to the ALJ and the court reverses the ALJ's decision because of legal error. The court "revers[es] the decision of the Commissioner" and "remand[s] the cause for a rehearing" under sentence four. 42 U.S.C. § 405(g).

The court notes that scant evidence was available regarding some of the crucial questions in this case. In particular, there was remarkably little factual development regarding Mr. M.'s anxiety between 2008 and the end of the insured period in September of 2014. Neither the ALJ nor Mr. M.'s counsel elicited sufficient testimony from Mr. M. or his lay witnesses on that topic. The record is also quite underdeveloped concerning Dr. H.'s retrospective opinion on the onset of Mr. M.'s anxiety disorder. See AR at p. 807 (one handwritten sentence attesting to Dr. H.'s retrospective opinion). The ALJ is reminded that he "bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 824 (8th Cir. 2008) (internal quotation omitted).

## ORDER

For the reasons given above, it is

ORDERED that Mr. M.'s motion to reverse the decision of the Commissioner (Docket 15) is granted.

IT IS FURTHER ORDERED that, pursuant to sentence four of 42 U.S.C. § 405(g), this case is remanded to the Commissioner for rehearing consistent with this opinion.

Dated February 24, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE